1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GABANA GULF DISTRIBUTION, LTD., | No. C 06-02584 CRB |
| Plaintiff, | **MEMORANDUM & ORDER** |
| v. | |
| GAP INTERNATIONAL SALES, INC., | |
| Defendant. | |

Plaintiffs Gabana Gulf Distribution and Gabana Distribution (collectively "Gabana")
are United Kingdom companies with worldwide principal places of business in Geneva,
Switzerland. Second Amended Complaint ("SAC") ¶ 1-2. Defendants Gap International
Sales, The Gap, Banana Republic, and Old Navy (collectively "Gap") are Delaware
companies with worldwide principal places of business in San Francisco, California. SAC ¶
3-6.

This case arises from a botched clothing distribution deal between Gabana and Gap.
On May 13, 2003, the parties entered into two agreements, the Excessive Inventory Program
Distributor License Agreement and the International Sales Program Distributor License
Agreement. Under the Excess Inventory Agreement, Gabana agreed to purchase 1.7 million
units of excess inventory from Gap for $6 million. See Anderson Decl. Exh. 8 (hereinafter
"Excess Inventory Agreement"), § 1(a). The agreement included several provisions relevant
to this motion, including the following:

1  •  § 1(a) [Gap] appoints [Gabana] as a non-exclusive Distributor for the sale of certain goods produced for [Gap] and offered to [Gabana] for resale by [Gabana]. . . . [Gabana] shall purchase the Authorized Goods from [Gap] and resell them for its own account, in its own name, to retail companies within each of the countries in the Territory.

•  § 1(d) Prior to offering any Authorized Goods for sale to any third party, Distributor shall apply for and obtain [Gap's] written approval of each of its customers and each retail store location where Authorized Goods will be sold by each customer. [...] [Gap] shall have the right, in its sole discretion, to approve, disapprove, or cancel at any time any Distributor customer and any retail store where any of Distributor's customers propose to sell or have sold Authorized Goods. [...]

•  § 1(f) . . . All Authorized Goods purchased pursuant to this Agreement must be sold directly and exclusively by [Gabana] to Authorized Retailers for sale in Authorized Stores within the Territory.

•  § 9(b) This Agreement may be terminated upon written notice, by any party for breach of any of its provisions by any other party to this Agreement, unless the breach is cured within thirty (30) days after the date of the notice of breach except as provided below. A breach by [Gabana] of any of the provisions of Sections 1, 2, 7 or 8 of this Agreement will provide [Gap] with all remedies available at law or in equity . . . and, at the option of [Gap], the right to immediate termination of this Agreement with no right of [Gabana] to cure the breach.

•  § 9(d) This Agreement may be terminated by any party without cause for any reason upon ninety (90) days' prior written notice to the other party to this Agreement. [Gap] may terminate this Agreement immediately upon written notice in the event Distributor's behavior causes actual and/or potential damage to [Gap's] reputation.

•  § 11(a) Choice of Law and Venue. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California as applied to agreements entered into and to be performed entirely within California between California residents. [...]

•  § 11(g) Relationship of the Parties. Distributor is an independent contractor. There is no relationship of agency, partnership, joint venture, employment, or franchise between [Gap] and Distributor. [...]

Gabana's agreement to purchase the excess inventory was a "condition precedent" to the effectiveness of the second contract entered into on May 13, 2003: the ISP Agreement. See Anderson Decl. Exh. 8, § 1(a). Thus, the ISP Agreement, which appointed Gabana as a non-exclusive distributor with the right to sell "first-line" Gap merchandise in certain Middle Eastern countries, only became effective once Gabana met its initial purchase obligation under the Excessive Inventory Program. See Anderson Decl. Exh. 9, § 9(a).

The 2003 ISP Agreement expired by its own terms on April 30, 2005. See id. § 9(b). However, Gap and Gabana entered into a new ISP Agreement, which superseded the original ISP Agreement, on September 1, 2004. See Anderson Decl. Exh. 10 (hereinafter "ISP

Agreement"). The 2004 ISP Agreement, which copied the material terms of the original ISP Agreement, is the primary subject of this litigation.

Pursuant to the contract, Gabana was authorized to purchase first-line goods from Gap "and resell them for its own account, in its own name, to retail companies" located in certain Middle Eastern countries. See id. § 1(a). In exchange, Gap promised "not to sell Authorized Goods directly to Authorized Retailers introduced by [Gabana] while" the Agreement remained in effect. Id. § 1(c). Like the Excess Inventory Agreement, the ISP Agreement could be terminated by any party without cause for any reason upon ninety days written notice. See id. § 9(d).

Although Gabana purchased and sold first-line goods in its own name, the ISP Agreement reflects that Gap maintained substantial control over Gabana's operation. Specifically, Gabana was required to apply for and obtain written approval of its customers and each retail store location where Gap goods would be sold. See id. § 1(d). The agreement also mandated that Gabana provide to each authorized retailer a copy of Gap's advertising and selling restrictions, monitor each retailer's compliance with those restrictions, place orders within minimums and maximums established by Gap, provide Gap quarterly reports detailing sale information, and provide Gap with annual financial statements related to sales of Gap products. See id. §§ 1(g), 3(a), 7(c), 7(e).

In addition to imposing affirmative obligations on Gabana, the Agreement set forth limitations on Gabana's activities. The Agreement prohibited Gabana from promoting or advertising Gap products in any manner not authorized by the contract, from distributing press releases including Gap brand names, from using or advertising any Gap trademarks other than those placed on Gap products, and from using any of Gap's trademarks on its business cards, stationary or in any other way. See id. §§ 1(g), 1(h), 2(d), 2(e).

On May 12, 2005, Gap sent its notice of termination of the ISP Agreement, pursuant to § 9(d) of that contract. In April 2006, Gabana filed this lawsuit in federal court under the Court's diversity jurisdiction. Its second amended complaint alleges breach of contract,

breach of the implied covenant of good faith and fair dealing, fraud, and unlawful and unfair business acts or practices. See SAC ¶¶ 37-63.

Gap moved to dismiss arguing that Gabana could not prevail on its breach of contract claim because the ISP Agreement provided for termination without cause. Gabana argued that the no-cause provision could not be enforced because it violated the California Franchise Relations Act, which prohibits a franchise from being terminated without cause and voids any stipulation to the contrary. See Cal. Bus. & Prof. Code §§ 20010, 20020.

The Court denied the motion to dismiss on the breach of contract claim, and denied the motion as to the other claims pending further factual development. Gap then moved for summary judgment on the remaining claims, and Gabana cross-moved on the question of whether it qualifies as a franchisee under California law. In addition, Gabana moved for summary judgment on Gap's counterclaims of breach of contract and breach of the covenant of good faith and fair dealing. Finally, Gabana moved to exclude the report of Gap's expert Michael Seid. On November 19, 2007, this Court granted Gap's motion as to Gabana's claims for breach of contract and fraud, but denied the motion as to Gabana's claims for breach of the implied covenant of good faith and fair dealing, and unfair competition. The Court also dismissed without prejudice Gap's claim for breach of the covenant of good faith and fair dealing, and denied Gabana's motion for summary judgment on Gap's contract claim, a ruling the Court reaffirmed in denying Gabana's motion for reconsideration on December 10, 2007. This memorandum sets forth in further detail the justification for the Court's rulings.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the non-moving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.

1  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). "Where the record taken

2  as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

3  'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

4  587 (1986) (citation omitted). A principal purpose of the summary judgment procedure "is to

5  isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317,

6  323-24 (1986).

7      A party moving for summary judgment that does not have the ultimate burden of

8  persuasion at trial has the initial burden of either producing evidence that negates an essential

9  element of the non-moving party's claims or showing that the non-moving party does not

10 have enough evidence of an essential element to carry its ultimate burden of persuasion at

11 trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

12 Where the party moving for summary judgment would bear the burden of proof at trial, it

13 bears the initial burden of producing evidence which would entitle it to a directed verdict if

14 the evidence went uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden

15 Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). If the moving party does not satisfy its initial

16 burden, the non-moving party has no obligation to produce anything and summary judgment

17 must be denied. If, however, the moving party satisfies its initial burden of production, then

18 the non-moving party may not rest upon mere allegations, or denials of the adverse party's

19 evidence, but instead must produce admissible evidence to show there exists a genuine issue

20 of material fact. See Nissan Fire & Marine, 210 F.3d at 1102.

21                                              **DISCUSSION**

22  A. Gap's Motion for Summary Judgment & Gabana's Motion for Partial Summary
    Adjudication on the Issue of Franchise

23

24  Plaintiffs allege three grounds for a breach of contract claim. Gabana Gulf argues that

    Gap breached the ISP Agreement by: (1) terminating the ISP Agreement without cause in
25
    violation of the California Franchise Relations Act ("CFRA"), see SAC ¶ 39; (2)
26
    systematically failing to approve retailers, see id. ¶ 43; and (3) selling first-line goods
27
    directly to retailers introduced to it by Gabana Gulf in violation of the Agreement's terms,
28
    see id. ¶ 44.

                                                   5

*1. Breach of Contract Predicated on California Franchise Relations Act*

Leaving aside the second and third grounds for breach, both parties have moved for summary judgment on issues related to the CFRA argument. Gabana moves for summary judgment on the issue of whether the agreement between the parties constituted a "franchise" agreement as defined by the CFRA. Gap has moved for summary judgment on the CFRA breach of contract claim, arguing that because Gabana was not a franchisee, its breach of contract claim must fail.

Whether Gabana was a franchisee is critical to maintaining the plaintiff's breach of contract cause of action. Gabana complains that Gap terminated the ISP Agreement without cause, but the Agreement provides that either party may terminate "without cause for any reason upon ninety (90) days prior written notice to the other party." ISP Agreement § 9(d). Accordingly, Gap's termination was lawful unless Gabana can establish that the Agreement is governed by the CFRA, which prohibits the termination of franchise agreements without cause. See Cal. Bus. & Prof. Code § 20020 ("[N]o franchisor may terminate a franchise prior to the expiration of its term, except for good cause.").

The CFRA defines "franchise" to mean an agreement by which:

> (a) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and
> (b) The operation of the franchisee's business pursuant to that plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
> (c) The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Bus. & Prof. Code § 20001 (emphasis added).

Because no reasonable juror could conclude that Gabana's business was substantially associated with Gap's trademark or other commercial symbol, Gabana's motion for summary judgment on the issue of franchise is DENIED, and Gap's motion for summary judgment on this claim for breach of contract is GRANTED.

The second element of § 20001 requires that Gabana establish that the operation of its business was substantially associated with Gap's trademark, service mark, trade name, logotype, advertising, or other commercial symbol. This element is satisfied where the

6

franchisee is granted the right to use the franchisor's symbol <u>or</u> where the trademark is communicated to customers of the supplier. <u>See</u> California Business, Transportation and Housing Agency, Release 3-F: When Does an Agreement Constitute a "Franchise"? at I.3 (June 22, 1994) (hereinafter "Release").[1]

The ISP Agreement expressly forbade Gabana from "adopt[ing] any trademark, service mark, trade name, trade dress or any element thereof" which might be considered the carry the risk of association with Gap. ISP Agreement § 2(e). The contract also prohibited Gabana from using Gap's trademark on its business cards, stationary or in any other way without prior written approval. <u>See id.</u> Gabana cannot argue that Gap granted it the right to use the Gap trademark merely because the trademark appeared on Gap clothing. <u>Cf.</u> <u>Mechanical Rubber & Supply Co. v. Am. Saw and Mfg. Co.</u>, 810 F. Supp. 986, 991 (C.D. Ill. 1990) ("The sole use of the mark alleged is that the Plaintiff marketed the Lenox brand product line. This does not satisfy the second element necessary to establish a franchise."). Accordingly, Gabana can only satisfy this element if it can establish that the Gap trademark was communicated to its customers.

Gabana argues that its customers did substantially associate the company with Gap's trademark because Gabana only traded in Gap products. But that argument only supports the conclusion that customers associated Gabana with Gap <u>products</u>; Gabana must establish something more, <u>i.e.</u>, that its customers associated Gabana with the Gap <u>trademark</u>.

Relying on <u>Kim v. Servosnax, Inc.</u>, 10 Cal. App. 4th 1346 (1992), Gabana argues that the substantial association prong can be satisfied even where the alleged franchisee is prohibited from using the franchisor's trademark. To be sure, the substantial association element is satisfied – even if the franchisee is prohibited from using the franchisor's trademark – so long as the franchisor's trademark is "communicated to the customers of the supplier," but <u>Kim</u> is inapposite to the facts in this case. In <u>Kim</u>, the franchisor, Servo,

---

[1] In 1994, the California Commissioner of Corporations issued guidelines clarifying the meaning of § 20001. These guidelines must be considered "prima facie evidence of the scope and intent of the coverage of the definition of 'franchise'" under the CFRA. Cal. Bus. & Prof. Code § 20009.

contracted with owners of office complexes to operate cafeterias, built out the space, opened the cafeteria for business, and operated the cafeteria for four to eight weeks until the operation was handed over to the franchisee. See id. at 1350. The court recognized that the office complex owners made a "key association" with the franchisor when they initially selected the franchisor to set up the facility and provide an operator to run it. See id. at 1357. Here, however, retailers in the Middle East did not initially contract with Gap and leave to Gap the responsibility of finding a Middle Eastern distributor. Thus, in contrast to Kim, the retailers in this case did not form the initial relationship with Gap directly.

The only evidence that Gap's trademark was ever communicated to retailers – other than in the form of Gap's clothing – is a series of sales report forms bearing a "Gap Inc." logo, which Gabana allegedly processed through its retailers. See Larsen Decl. GAB_066692-066978. However, the reporting form that Gabana references is a form that, according to the ISP Agreement, was intended to be filled out by Gabana and sent directly to Gap. See ISP Agreement § 7(c) ("Distributor shall provide to [Gap] quarterly . . . monthly sales reports in the form provided in Exhibit D."); see also ISP Agreement Exh. D (Liability Inventory Distributor – Sales Documentation form). Indeed, Gabana appears to have unilaterally modified the form so that it requests retailer information, rather than information from the distributor, i.e., Gabana. For example, the form attached to the ISP Agreement is entitled "Liability Inventory Distributor – Sales Documentation," whereas Gabana's form is entitled "ISP Retailer – Sales Documentation." In the same vein, Gabana has altered the form to request "Retailer Information," such as name and address, rather than "Distributor Information." Finally, whereas the original form requests that the form be sent directly to Gap, the modified form requests that it be forwarded to Gabana.

In short, if Gabana processed reporting forms bearing the "Gap Inc." logo through retailers, it did so in contravention of the ISP Agreement. Gabana will not be allowed to

8

create a triable issue by breaching the terms of the ISP Agreement.[2]  Because there is no

other evidence that would permit a juror to conclude that Gabana was substantially

associated with Gap's trademark, Gap's motion for summary judgment on this breach of

contract claim is GRANTED, and Gabana's motion for summary judgment on the issue of a

franchise is DENIED.

### *2. Breach of Contract: Sales to Gabana-Introduced Retailers*

Gap also moves for summary judgment on Gabana's second theory for breach of

contract: that Gap breached the ISP Agreement by selling first-line goods directly to retailers

introduced to it by Gabana Gulf.  See SAC ¶ 44; see also ISP Agreement § 1(c) (prohibiting

Gap from selling first-line goods to "Authorized Retailers" introduced by Gabana while the

Agreement was still in effect).

Gap argues that the claim must fail because: (1) there is no evidence that Gap sold

goods to a retailer before the termination of the contract; and (2) Gap never sold produced to

any entity that was operating as a retailer.  There is no evidence in the record that Gap dealt

with the retailer Al Turki before August 10, 2005 when the ISP Agreement terminated.  Any

sale to Al Turki after August 10, 2005 was not contradictory to the ISP Agreement's terms,

which controlled only while the agreement was still in operation.  Accordingly, summary

judgment is GRANTED to Gap on this breach of contract theory.

### *3. Breach of Contract & Implied Covenant of Good Faith & Fail Dealing: Systematic Failure to Approve Retailers*

Gabana's final breach of contract claim is based on the same conduct that underlies its

claim for breach of the covenant of good faith and fair dealing: Gap's systematic failure to

approve retailers submitted for approval by Gabana.  See SAC ¶¶ 43, 50.  Because Gap's

failure to approve retailers did not violate the express terms of the contract, summary

judgment is GRANTED to Gap on the claim for breach of contract.  However, because there

---

[2] Gap also argues that the "Gap Inc." logo is not a trade name but is merely a corporate identity.  See Gruber Decl. ¶ 3.  This conclusion of law is off the mark and is rejected.  Under California law, a trade name is any "word, name, symbol, device or any combination thereof" used by a person to identify his business and distinguish it from the business of others.  Cal. Bus. & Prof. Code 14208.  "Gap Inc." is a trade name because it identifies the Gap brand and distinguishes it from the business of others.

United States District Court
For the Northern District of California

1    is a triable issue whether Gap performed the contract in bad faith, summary judgment is

2    DENIED as to the breach of covenant claim.

3                                    i. Breach of Contract

4           The ISP Agreement expressly provided that Gap "shall have the right, in its sole

5    discretion, to approve, disapprove or cancel at any time any Distributor customer and any

6    retail store where any of Distributor's customers propose to sell or have sold Authorized

7    Goods." ISP Agreement § 1(d).

8           Thus, the contract authorized Gap to approve or reject Gabana's proposals. "[I]f

9    defendants were given the right to do what they did by the express provisions of the contract

10   there can be no breach." Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342,

11   374 (1992) (quotation omitted). Accordingly, Gabana's claim for breach of contract must

12   fail.

13                  ii. Breach of the Implied Covenant of Good Faith & Fair Dealing

14          Even a defendant who does not breach a contract may still be liable for breach of the

15   covenant of good faith and fair dealing if they fail to perform the contract in good faith. See

16   id. at 373. In this case, Gabana argues that even though Gap reserved the discretion to deny

17   proposals, they exercised that right in bad faith by instituting a freeze on all new retail stores

18   – regardless of the merits of the proposal – because Gap's international division was in

19   transition. Gap officials admitted in a deposition that the company instituted a freeze that

20   lasted from July or August 2004 into 2005 when additional hires in the international division

21   were finalized, see Danaye-Elmi Decl, Exh. D at 124:8-125:13, and that during that time,

22   Gap would not and did not approve any new stores in the Middle East, see id. Exh. I at

23   130:4-7.

24          There are two legal principles in some tension with each other that are at play with

25   respect to the breach of covenant claim. On the one hand, "[t]he covenant of good faith finds

26   particular application in situations where one party is invested with a discretionary power

27   affecting the rights of another. Such power must be exercised in good faith." Carma, 2 Cal.

28   4th at 372. On the other hand, the covenant cannot "be read to prohibit a party from doing

                                              10

1  that which is expressly permitted by an agreement.  On the contrary, as a general matter,

2  implied terms should never be read to vary express terms."  Id. at 374.

3       California courts have harmonized these two principles in analogous cases by

4  examining whether the contract gives the defendant merely the power to exercise discretion,

5  or whether it gives the defendant the greater power to refrain from acting at all.  See Locke v.

6  Warner Bros., Inc., 57 Cal. App. 4th 354, 367 (1997).  Thus, in Third Story Music, Inc. v.

7  Waits, 41 Cal. App. 4th 798 (1995), music company Third Story Music sued Tom Waits and

8  Warner Communications, arguing that the defendants breached the covenant of good faith by

9  refusing to allow certain Waits compositions to be included on a new CD.  The contract

10  between the parties provided that Warner had the right "to manufacture, sell, distribute and

11  advertise records or other reproductions," and also stated that Warner "may at our election

12  refrain from any or all of the foregoing."  Id. at 801.  The court affirmed demurrer in favor of

13  defendants, concluding that the express language of the contract precluded the plaintiff from

14  proceeding on its legal theory.

15       In contrast to Waits, the court in Locke did allow the plaintiff to proceed on a breach

16  of covenant theory even though the contract at issue gave the defendant discretionary rights.

17  In Locke, a movie studio had an agreement with actress Sondra Locke that gave the studio

18  the right of first refusal over Locke's movie project proposals and the right to use her

19  services as a director.  When the studio declined to develop any of her proposals, Locke sued

20  for breach of contract, claiming the agreement was a sham.  The appellate court reversed the

21  trial court's grant of summary judgment and held that a question of fact existed on whether

22  the studio violated the implied covenant of good faith and fair dealing.  The development

23  agreement allowed the movie studio to make its own subjective creative decisions about

24  Locke's movie proposals, and the court applied the general principle that when a condition of

25  a promisor's duty is subjective satisfaction with the promisee's performance, the promisor is

26  nonetheless required to exercise his subjective judgment honestly and in good faith pursuant

27  to the implied covenant of good faith and fair dealing.  The court observed that whereas the

28  contract in Waits "expressly provided Warner Communications had the right to refrain from

11

1  marketing the Waits records," the Locke/Warner agreement "did not give Warner the express

2  right to refrain from working with Locke.  Rather the agreement gave Warner <u>discretion</u> with

3  respect to developing Locke's projects."  57 Cal. App. 4th at 366, 367 (emphasis in original).

4      This case is controlled by <u>Locke</u> rather than <u>Waits</u> because Gap merely bargained for

5  the right to exercise "discretion" over proposals made by Gabana; Gap did not bargain for the

6  right to refrain from approving all proposals altogether.  Accordingly, the express terms of

7  the contract do not preclude Gabana from proceeding on a breach of covenant theory.

8      The next step, therefore, is to analyze Gabana's claim under breach of covenant

9  jurisprudence.  As set forth by the California Supreme Court in <u>Carma</u>, a breach of covenant

10  claim based on the allegedly bad faith exercise of discretion turns on whether the defendant

11  exercised its discretion "for any purpose within the reasonable contemplation of the parties at

12  the time of formation."  <u>Carma</u>, 2 Cal. 4th at 372 (quotation omitted).  Thus, to prevail,

13  Gabana must prove that the parties did not contemplate that Gap could reject proposals for

14  retail stores based on criteria other than meritoriousness, such as hiring needs or staff

15  transition.

16      Whether Gap exercised its discretion for a purpose that was within the reasonable

17  contemplation of the parties at the time they signed the ISP Agreement is a triable question

18  that must be answered by the jury.  Accordingly, summary judgment to Gap is DENIED on

19  the breach of covenant claim.

20          *4. Fraud*

21      Gabana has alleged that Gap falsely represented that it would approve of retailers

22  pursuant to the terms of the ISP Agreement whereas Gap had no intention to approve such

23  retailers.  <u>See</u> SAC ¶¶ 54-55.

24      To maintain a claim for fraud, Gabana must prove that: (1) Gap made a

25  misrepresentation; (2) with knowledge of its falsity; (3) with the intent to defraud; (4) which

26  Gabana reasonably relied upon; (5) to its detriment.  <u>See</u> <u>Buckland v. Threshold Enters., Ltd.</u>,

27  155 Cal. App. 4th 798, 807 (2007).

28

1    Gap argues that Gabana's claim fails at the outset because there is no evidence Gap

2 ever misrepresented an intention to approve each and every retailer proposed by Gabana, or

3 that it would even approve a particular retailer.  Gap notes that Gabana's co-CEO Francois

4 Larsen admitted in his deposition that Gap did not promise to approve various retailers.  See

5 Anderson Decl. Exh. 23 at 247:5-17; 253:19-22; 259:5-8.  In its response, Gabana narrows

6 the focus of its fraud claim.  Gabana limits the fraud claim to Gap's alleged representation

7 that Gabana could expand into new territories, which Gap did when it referred a retailer in

8 Turkey – Baser Holdings – to work with Gabana.  According to Gabana, Gap made this

9 referral without the intent of actually approving Baser as a retailer.

10    The record reflects that on November 13, 2003, Gap representative Jon Ehlen emailed

11 Gabana the following message: "Another question for you.  Mr. Bassar, whom I believe you

12 sell Excess to, met with me on my last trip to Turkey.  He wanted to buy ISP directly.  Do

13 you think he would be a good retail business partner for Gabana?  If not, would you mind if I

14 sold him ISP in addition to Excess? . . .  I feel he could do a much better job if the

15 assortment, shop concept and merchandising were supported by ISP (or ISP through

16 Gabana)."  Danaye-Elmi Decl. Exh. D at Exh. 14.  The next year, in September 2004,

17 Gabana submitted to Gap a business proposal for expanding into Baser retail stores in

18 Turkey.  See Danaye-Elmi Decl. Exh. L.

19    Gabana objects that because Gap instituted a freeze on all new ISP retail locations in

20 July or August of 2004 due to transition in the company's international division, Gap had no

21 intent of actually approving the Baser location.  However, Gabana's claim fails because it

22 has not adduced any evidence that Gap did not intend to approve a Baser retail store when

23 the allegedly fraudulent statement was made.  See Magpali v. Farmers Group, Inc., 55 Cal.

24 Rptr. 2d 225, 231 (Cal. Ct. App. 1996) ("A promise of future conduct is actionable as fraud

25 only if made without a present intent to perform.") (emphasis added).

26    It is true that during the expansion freeze, Ehlen continued to ask Gabana to provide a

27 business proposal for Turkey so that he could review it.  See Ehlen Dep. at Exh. 37 (e-mail

28 dated September 9, 2004).  In early December – one day before the Turkey proposal was

13

1   denied due to the freeze – Ehlen again requested the Turkey proposal, explaining that "I was

2   hoping to have today so that we could try to get all three approved and move forward." See

3   Danaye-Elmi Decl. Exh. J at Exh. 26.

4          But all Gabana has established is that Gap official Ehlen requested that Gabana do

5   work on a Turkey proposal and then failed to approve it.  Failure to fulfill a "promise" is not,

6   by itself, sufficient to sustain a claim for fraud.  See Conrad v. Bank of Am., 45 Cal. App.

7   4th 133, 157 (1996).  There is no evidence to contradict the possibility that Ehlen sincerely

8   hoped to guide the Turkey proposal through the approval process as an exception to the

9   freeze.  Gabana could have overcome the motion for summary judgment with circumstantial

10  evidence of fraudulent intent – such as that Ehlen failed to even attempt performance, see

11  Tenzer v. Superscope, Inc., 39 Cal. 3d 18, 30 (1985) – but no such evidence has been

12  adduced.  Accordingly, summary judgment is GRANTED to Gap on the fraud claim.

13              *5. California Business & Professions Code § 17200*

14         Because the Court has denied summary judgment to Gap on the breach of covenant

15  claim, summary judgment must also be DENIED as to the § 17200 claim because Gabana

16  may use the covenant claim as a predicate for § 17200 liability.  Although the state of §

17  17200 jurisprudence is in rapid flux, California courts have not yet foreclosed common law

18  theories – such as breach of the covenant of good faith – as a basis for actions pursuant to §

19  17200.  See Mercado v. Allstate Ins. Co., 340 F.3d 824, 828 n.3 (9th Cir. 2003); Diaz v.

20  Allstate Ins. Group, 185 F.R.D. 581, 595 (C.D. Cal. 1998) ("[A]llegations of fraudulent and

21  unfair business activity are sufficient to state a cause of action for relief under the UCA.").

22         B. Gabana's Motion for Summary Judgment on Gap's Counterclaims

23         In addition to filing an answer to Gabana's complaint, Gap filed counterclaims

24  alleging breach of contract and breach of the implied covenant of fair dealing.  According to

25  Gap's complaint, Gabana: (1) breached the Excess Inventory Agreement by selling

26  approximately 225,000 units of excess inventory to Al Turki, an unauthorized retailer; and

27  (2) breached both the Excess Inventory Agreement and the ISP Agreement by transferring or

28  selling its distribution rights to Al Turki and Roots Ready.  See Counterclaim ¶¶ 24, 26.  Gap

14

**United States District Court**
For the Northern District of California

1    also alleges that Gabana breached the covenant of good faith and fair dealing by transferring

2    its distribution rights to Roots Ready and Al Turki in bad faith.  See id. ¶ 30.

3                    *1. Breach of Contract*

4            Gabana argues that it is entitled to summary judgment on the breach of contract claim

5    based on the sale of excess inventory to Al Turki on the ground that the undisputed evidence

6    establishes that Gabana did not sell 225,000 units of inventory to Al Turki.

7            Gabana forwards a series of arguments in support of its motion.  First, Gabana argues

8    that it immediately sold the entire inventory of goods to Roots Ready, and it was Roots

9    Ready who then sold inventory to Al Turki in early 2004.  See Isabelle Richard Dep. at

10   124:11-17 (Gabana official stating that Roots Ready sold excess products to Al Turki).

11           But even if the sale was conducted by Roots Ready, Gabana assumed responsibility

12   for breaches committed by its authorized retailers.  See Excess Inventory Agreement at 9(b)

13   ("[Gabana] agrees that a breach of any terms of this Agreement by [Gabana], any Authorized

14   Retailer or any director, officer, employee, agent, independent contractor or consultant of

15   [Gabana] or any Authorized Retailer will be deemed to be a breach by [Gabana].") (emphasis

16   added).  Thus, even if Roots Ready were an Authorized Retailer, a breach occurred when

17   Roots Ready sold to Al Turki, which was at that time an unauthorized retailer.

18           Second, Gabana argues that summary judgment is appropriate because Gap was fully

19   aware of Roots' sale of excess inventory to Al Turki.  But even where an injured party

20   continues to perform on a contract, with knowledge of the other party's breach, and where he

21   accepts further performance from the guilty party after the breach, the injured party may still

22   seek compensation for the breach.  See Cal. BAJI 10.88 ("Instead of treating a breach as a

23   termination of the contract, the injured party may waive the breach, by electing to treat the

24   contract as still alive, and remaining ready and able to perform on [his] [or] [her] own part,

25   thereby limiting the claim to damages caused by the breach.").  Thus, even if Gap were

26   aware of the breach and continued to perform under the contract, it did not thereby waive its

27   right to seek damages.

28

15

1    Third, Gabana argues that it is entitled to summary judgment because Gap never

2    provided it with the opportunity to cure any alleged breach.  In support of its argument,

3    Gabana relies on a provision in the contract providing that the agreement could "be

4    terminated upon written notice . . . for breach . . . unless the breach is cured within thirty (30)

5    days after the date of notice of the breach."  Excess Inventory Agreement § 9(b) (emphasis

6    added).   But this provision does not preclude Gap from suing for breach.  The provision

7    merely provides that the contract cannot be terminated if the breach is cured, it says nothing

8    about the right to subsequently sue for breach.  In this case, Gap did not attempt to terminate

9    the contract pursuant to § 9(b); rather, the Excess Inventory Agreement terminated of its own

10   accord on April 30, 2005.  See id. § 9(a).  Thus, it is irrelevant what the contract said about

11   Gap's right to terminate for breach.

12       Fourth, Gabana argues that summary judgment is appropriate because Gap did not

13   suffer damages as a result of any breach.  But according to Gap, excess inventory sold to

14   Gabana ended up in countries like India in violation of the terms of the contract.  Gap has

15   adduced evidence that it was forced to spend thousands of dollars in an effort to obtain an

16   injunction preventing the sale of those excess clothes in India.  Under California law, Gap is

17   entitled to recover as damages any attorney's fees spent in the India litigation if: (1) such fees

18   were proximately caused by Gabana's breach; and (2) such damages "may reasonably be

19   supposed to have been within the contemplation of the parties to the contract at the time they

20   entered into the agreement."  De La Hoya v. Slim's Gun Shop, 80 Cal. App. 3d Supp. 6, 10

21   (1978); see also Cal. Civ. Code § 3300.

22       Gabana asserts that Gap cannot claim legal expenses it incurred in the India litigation

23   "because Gap lost that litigation."  Even though Gap may have lost a portion of the India

24   litigation – the portion directed against Indian retailers – a jury could still reasonably

25   conclude that the costs of such litigation were proximately caused by Gabana's conduct.

26   After all, even if Gap's litigation efforts in India are ultimately unsuccessful, recovery of

27   attorney's fees may still be appropriate if the litigation was "proper."  Ninth Ave. & Forty-

28   Second St. Corp. v. Zimmerman, 217 A.D. 498, 500 (N.Y. App. Div. 1926).  Based on the

16

United States District Court
For the Northern District of California

1  facts in the record, reasonable jurors could disagree over whether the India litigation was

2  proper.

3       Gabana also argues that summary judgment is appropriate because it cannot be said

4  that it was within Gabana's reasonable contemplation when it entered into the ISP

5  Agreement that it would bear the cost of unsuccessful foreign litigation by Gap against third

6  parties. Gap is not required to show that the parties actually contemplated the very

7  consequence that occurred, but merely that foreign litigation against third parties was a

8  consequence "such as the parties may be reasonably supposed, in the light of all the facts

9  known, or which should have been known to them, to have considered as likely to follow in

10  the ordinary course of things, from a breach." Ely v. Bottini, 179 Cal. App. 2d 287, 294

11  (1960) (citations omitted). Generally, whether particular damages were within the

12  reasonable contemplation of the parties is a question for the jury. See De La Hoya, 80 Cal.

13  App. 3d at 11. Just so here, a reasonable juror could conclude that foreign litigation would

14  follow in the ordinary course of things as a result of Gabana's sale of Gap clothing to

15  unauthorized and illegal sub-distributors. Accordingly, there is at least a triable issue that

16  Gap suffered damages as a result of Gabana's breach.

17       Gap's second allegation for breach of contract stems from Gabana's decision to

18  transfer its distribution rights to other companies that acted as distributors, including Roots

19  Ready and Al Turki. Again Gabana argues that summary judgment is appropriate because:

20  (1) Gap was aware of any breach; (2) Gap did not provide Gabana with an opportunity to

21  cure; and (3) Gap did not suffer damages. For the same reasons as provided above, Gap's

22  knowledge does not preclude it from obtaining damages, Gap was not required to provide

23  Gabana with an opportunity to cure before filing suit, and there is at least a triable issue that

24  Gap suffered damages. Accordingly, summary judgment is also DENIED as to this breach of

25  contract claim.

26                    *2. Breach of Covenant of Good Faith & Fair Dealing*

27       The gist of Gap's breach of covenant allegation is that Gabana not only breached the

28  contract, it did so in bad faith. To be sure, the covenant of good faith and fair dealing is

17

1 breached when the other party breaches express terms of the contract. But in that event, the

2 measure of damages for such a breach remains solely contractual. See Guz v. Bechtel Nat'l

3 Inc., 24 Cal. 4th 317, 327 (2000). "Hence, where breach of an actual term is alleged, a

4 separate implied covenant claim, based on the same breach, is superfluous." Id.

5      Gap's complaint merely alleges that the covenant of good faith was breached when

6 the express terms of the contract were breached; there is no other theory of liability.

7 Accordingly, the breach of covenant claim is superfluous, and it is DISMISSED without

8 prejudice.

9      C. Gabana's Motion to Strike Expert Report of Michael Seid

10      Gabana moves to exclude the expert report of Michael Seid – in which Seid opines on

11 the types of business procedures and techniques that are customarily observed in franchising

12 and distributorships – because the report: (1) represents a legal conclusion; (2) is irrelevant to

13 the question of whether the ISP Agreement constituted a franchise; and (3) cannot be squared

14 with the undisputed evidence in this case.

15      The Court arrived at its conclusions on the issue of franchise without relying on the

16 Seid report. Accordingly, the motion to strike is DENIED as moot.

17      **IT IS SO ORDERED.**

19 Dated: January 9, 2008            CHARLES R. BREYER
                                     UNITED STATES DISTRICT JUDGE

18